[No. 13805.   Department Two.   June 4, 1917.]

GENERAL MARKET COMPANY, *Appellant*, v. POST-
INTELLIGENCER COMPANY, INCORPORATED,
*Respondent.*[1]

LIBEL AND SLANDER—ACTIONABLE WORDS—VIOLATION OF FOOD LAW
—STATUTES.  A news publication that plaintiff owned a quantity of
cheese which was destroyed as unfit for human consumption, is not
libelous *per se* as charging a violation of Rem. Code, § 5453, making
it a misdemeanor to sell, or have in possession with intent to sell,
adulterated food; since possession with intent to sell is an essential
element of the offense.

SAME—ACTIONABLE WORDS—INJURY TO BUSINESS.  It is not libel-
ous *per se* as tending to injure the business of a dealer to publish as
a news item that it owned part of a quantity of cheese, seized and
destroyed by the state as unfit for food, there being no charge that
the dealer had violated any statute or intended to sell the cheese.

SAME—COMPLAINT—SPECIAL DAMAGES.  Where words are not li-
belous *per se*, it is necessary to allege special damages.

Appeal from a judgment of the superior court for King
county, Smith, J., entered April 25, 1916, upon sustaining a
demurrer to the complaint, dismissing an action for libel.  Af-
firmed.

*Wm. H. Bolen,* for appellant.

*Hughes, McMicken, Dovell & Ramsey,* for respondent.

FULLERTON, J.—This is an action for libel.  The amended
complaint of the plaintiff, omitting the caption and conclu-
sion, is as follows:

"(1)   That during all the times herein mentioned the
plaintiff General Market Company was and now is a cor-
poration, created, organized and existing under and by virtue
of the laws of the state of Washington, and having its prin-
cipal place of business at Seattle, King county, Washington,

[1]Reported in 165 Pac. 482.

and having paid its license fee for the current year to the state of Washington.

"(2)   That the plaintiff is the owner and operator of a large and profitable public market, known as the Westlake Public Market, or more generally known throughout the city of Seattle and the state of Washington as the 'Westlake Market,' located at Fifth avenue, Westlake avenue and Pine street, in the city of Seattle, King county, Washington, where food products and fruits of all kinds are kept, offered for sale and sold to the general public of said city of Seattle and state of Washington; and was and now is dealing with the general public as its patrons throughout said city and state.

"(3)   That the defendant Post-Intelligencer Co., Inc., is a corporation of the state of Washington, owning and operating and publishing a daily morning newspaper, known as The Post-Intelligencer, having a large general circulation throughout said city of Seattle and state of Washington.

"(4)   That on the 4th day of March, 1916, the defendant published in said newspaper called the Post-Intelligencer the following words of and concerning the plaintiff in its trade and business:

"'TONS OF FOOD FOUND UNFIT FOR CONSUMPTION.

"'Property owned by Storage Company and Westlake Market Condemned by State.

"'Food products of several tons weight, including 3,300 pounds of cheese, 103 boxes of oranges, and three and one-half barrels of salt herring, were seized and destroyed in the last week as unfit for human consumption by Will H. Adams of the State Department of Agriculture.

"'The Diamond Ice and Cold Storage Company owned 2,700 pounds of the cheese, and the Westlake Market owned the remaining 600 pounds. The oranges were shipped to the Produce Distributors Company of Seattle, from California. Part of the shipment was sent to Everett and part to Victoria. The Everett shipment was traced and also condemned. The herring were seized in Everett.'

"(5)   That the defendant meant thereby the Westlake Public Market, and it was so understood by the readers of its morning newspaper, the Post-Intelligencer, to be the Westlake Public Market.

"(6)   That the said publication was false and defamatory.

"(7)   That the said false and defamatory words were published of and concerning this plaintiff, and was so understood and meant by this defendant, and was so understood by the readers of its morning newspaper, the Post-Intelligencer.

"(8)   That the plaintiff has been injured in its reputation and business and trade by reason of said false and defamatory publication to its damage in the sum of $50,000."

To the amended complaint the defendant interposed a general demurrer, which the trial court sustained. The plaintiff elected to abide by its complaint, whereupon the court entered a judgment of dismissal with costs. This appeal followed.

There are certain words which, when spoken or published of or concerning another, are actionable *per se*. This means that they are actionable without allegation or proof of an actual injury, because their natural, necessary, and proximate consequence is to cause injury to the person of whom they are spoken or published, thus giving rise to a conclusive presumption of law that an actual injury was caused thereby. What words are so actionable is not always easy of determination, and many confusing and conflicting decisions on the question can be found. It is the general consensus of opinion, however, that words are so actionable which charge the commission of a punishable crime, or which tend to injure a person in his occupation, trade, business, or profession. Since appellant has not, in his complaint, alleged special damages, it must be held, if it is to be held that its complaint states a cause of action, that the words complained of therein are actionable *per se*.

The appellant contends that the words are thus actionable under either or both of the general rules stated. It is said that the words published charge the commission of a crime because of the pure food and drug act (Rem. Code, § 5453 *et seq.*), which makes it a misdemeanor to sell, offer for sale,

19—96 WASH.

have in possession with intent to sell, or manufacture for sale any article of food which is adulterated within the meaning of the act.  But it is manifest, we think, that the article as published does not charge the appellant with doing any of these things.  The charge is that a certain quantity of cheese, with other articles of food, was seized and destroyed as unfit for human consumption, by an official of the state department of agriculture, and that a part of the quantity of cheese was owned by the appellant.  There is no charge that it sold the cheese, offered it for sale, held it in possession with intent to sell, or manufactured it for sale.  It is not even charged that the appellant held it in possession.  All that is charged is ownership.  While the right of possession usually follows ownership, actual possession need not, and to charge the one is not to charge the other.  But even if possession were charged, it would not be to accuse it of crime. The appellant, by its own affirmative allegations, is a vender of perishable food products.  It would be strange indeed if, among its general stock of products, it did not at all times own and possess something that is unfit for human consumption; this, because of the natural tendency of such products to decay, and the practicable inability to make selections when purchases of stock are made.  But these are not acts the statute makes criminal.  The statute punishes those who wilfully purchase and vend the prohibited products, not those who own them from the necessities of the case but do not vend or offer to vend them.

Whether the publication is actionable *per se*, because tending to injure the appellant in its business, is a more difficult question, but we think this was also correctly determined by the trial court.  The article bears evidence on its face that it was a news item, reciting the activities of the state department of agriculture for the preceding week.  Its general truthfulness is not negatived by the complaint; that is, it is not negatived that the department named did seize and destroy, as unfit for human consumption, the quantity of

cheese, oranges, and salt herring mentioned therein.   But
the complaint is that the article falsely set forth as a fact
that 600 pounds of the cheese so seized and destroyed were
owned by the appellant.   A hasty reading of the complaint
might seem to indicate otherwise, but it will be observed that
it is alleged that the false and defamatory words were pub-
lished of and concerning the appellant, and the only thing
published of and concerning the appellant is that it owned
600 pounds of the 3,300 pounds of the cheese seized and de-
stroyed.   The question then narrows itself to this, is it libel-
ous *per se* to publish that certain food products, which were
seized and destroyed by a public health officer as unfit for
human consumption, were owned in part by a certain person
when such person did not in fact own any part of them.

It must be remembered, when the question is considered,
that the publication contains no charge of the violation of a
criminal statute, no charge that the vendor offered the goods
for sale, held them for sale, intended at some future time to
sell them, or had them in possession.   For all that appears
in the publication, the goods may have been purchased at
some distant place under an order calling for wholesome and
edible products, and seized by the health officer while in the.
course of shipment, or while they were in some warehouse or
depository before they were examined or delivered to the
appellant.   Indeed, this would seem a natural inference from
the language of the article.   The exact weight of the cheese
seized is given, and the number of pounds owned by each of
the parties named as owner is likewise given; the inference
naturally following that the cheese was in one bulk and
owned in the proportions stated by the person named.   Nor
is there a charge that the appellant knew of the unwhole-
some condition of the cheese, and there is no presumption
that a dealer in food products knows the condition of all
the goods that it owns.   He must know, or at least is pre-
sumed to know, the condition of such products as he sells or
offers for sale to others; but it is common knowledge that a

dealer in such products must buy from other dealers or from producers, often without inspection or the chance of inspection, and no one would suppose, we think, that, because such a dealer was found at some time to be the owner of an unwholesome food product, he was dealing in such products, or was in any way unworthy of trust or confidence. The natural, necessary, and proximate consequence of mistakenly and untruthfully publishing a charge of such a dealer that he was such owner cannot, therefore, be to injure him in his business, and it must follow that the publication of such a charge is not actionable *per se*. This is not to deny that injury may follow such a publication; it is but to deny that injury naturally or necessarily follows it. If injury does follow the publication, the injured party is not without remedy; he has but to allege and prove actual damage in order to recover.

The learned counsel for the appellant has industriously collected a large number of cases touching the law of libel. These we think it unprofitable to review. It would be to do no more than emphasize a condition already confessed; namely, that the courts are widely divergent on the question as to what matters published will constitute libel actionable *per se*.

The judgment should be affirmed, and it is so ordered.

ELLIS, C. J., MOUNT, and PARKER, JJ., concur.

HOLCOMB, J., concurs in the result.